**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SHARIKA SAWER, individually and on behalf of all other persons similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ARLOZOROV9, INC., d/b/a ALMA<br><br>Defendant. | Civil Action No. 1:26-cv-00732-JMF<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Sharika Sawer ("Plaintiff") files this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Arlozorov9, Inc. d/b/a Alma ("Alma" or "Defendant"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of a class and subclass of all persons in the United States and residents of California, respectively, who, during the class period, had their personally identifiable information ("PII") and/or protected health information ("PHI") improperly intercepted by or otherwise disclosed to third-party Google LLC ("Google"), as a result of using the Alma website (available at helloalma.com, hereinafter, the "Website"), which is owned, operated, and controlled by Defendant.

2. Defendant aids, employs, agrees with, and otherwise enables Google to intercept Plaintiff's and Class Members' communications while using the Website, including communications containing PII and/or PHI. Plaintiff brings this action for legal and equitable remedies resulting from these illegal actions.

## JURISDICTION AND VENUE

3. The Court has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 members of the Class, and there is minimal diversity.

4. The Court has personal jurisdiction over Defendant because Defendant is domiciled in the State of New York.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant resides in this District.

## THE PARTIES

***Plaintiff Sharika Sawer***

6. Plaintiff Sharika Sawer is an adult citizen of the state of California and is domiciled in Twentynine Palms, California.

7. On or around April 3, 2024, Plaintiff Sawer visited the Website on the same browser that she used to access Google's products and services[1] (including Gmail). Plaintiff Sawer was in California when she visited the Website. Upon accessing the Website, Plaintiff Sawer scheduled a consultation for individual therapy for herself in the manner described in more detail below.

8. Because Plaintiff accessed the Website to schedule a consultation for individual therapy, and because of Defendant's actions as alleged herein, Plaintiff's use of the Website has led to the unlawful interception of her medical information, including information regarding her medical condition, history, and treatment.

9. Specifically, as a result of Defendant's unlawful conduct as alleged herein, third-party Google intercepted information about the therapy consultations Plaintiff and Class Members

[1] *See* GOOGLE, PRODUCTS, https://about.google/intl/ALL_us/products/.

scheduled on the Website—namely, the type of therapy they are looking for, areas they want to focus on (*e.g.*, depression), the approach they want their provider to take in therapy (*e.g.*, confronting trauma), preferences as to their provider's identity (*i.e.*, their provider's faith, gender, race, and/or sexuality), where they are seeking therapy, whether they are seeking virtual or in-person care, how they plan to pay, the name of the provider with whom they select to book a consultation, and the fact that patients actually booked a consultation.

10. Pursuant to the systematic process described herein, Defendant assisted third-party Google with intercepting Plaintiff's communications, including those that contained PII, PHI, and related confidential information. Defendant assisted these interceptions without Plaintiff's knowledge, consent, or express written authorization.

11. By failing to receive the requisite consent, Defendant breached its duties of confidentiality and unlawfully disclosed Plaintiff's PII and PHI.

***Defendant Arlozorov9, Inc. d/b/a Alma***

12. Arlozorov9, Inc. d/b/a Alma ("Alma" or "Defendant") is incorporated in New York and has its principal place of business at 480 6th Avenue, Suite 260, New York, NY 10011. Defendant facilitates a variety of therapy health care services for its patients, such as individual therapy, couples therapy, medication management, child or adolescent therapy, and family therapy.[2] Patients can book online consultations with medical practitioners to access medical care and manage their treatment or diagnosis of medical conditions through the Website.

## FACTUAL ALLEGATIONS

### I. The California Invasion of Privacy Act

13. The California Legislature enacted the Invasion of Privacy Act to protect certain privacy rights of California citizens. The legislature expressly recognized that "the development

[2] *See* ALMA, *Find the provider who's right for you*, https://secure.helloalma.com/providers-landing (last accessed September 9, 2025).

of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

14. The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

15. Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis added; internal citations omitted).

16. As part of CIPA, the California Legislature enacted § 631(a), which prohibits any person or entity from [i] "intentionally tap[ping], or mak[ing] any unauthorized connection … with any telegraph or telephone wire," [ii] "willfully and without the consent of all parties to the communication … read[ing], or attempt[ing] to read, or to learn the contents or meaning of any … communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]," or [iii] "us[ing], or attempt[ing] to use … any information so obtained."

17. CIPA § 631(a) also penalizes [iv] those who "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit"

the wiretapping.

18. As part of the Invasion of Privacy Act, the California Legislature additionally introduced Penal Code § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

19. A "confidential communication" for the purposes of CIPA § 632 is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto." Cal. Penal Code § 632(c).

20. Individuals may bring an action against the violator of CIPA §§ 631 and 632 for $5,000 per violation. Cal. Penal Code § 637.2(a)(1). Plaintiff does so, here, against Defendant.

## II. The California Confidentiality of Medical Information Act

21. Pursuant to the California Confidentiality of Medical Information Act ("CMIA"), "[a] provider of health care … shall not disclose medical information regarding a patient of the provider of health care … without first obtaining an authorization, except as provided in subdivision (b) or (c)." Cal. Civ. Code § 56.10(a).[3] "An authorization for the release of medical information … shall be valid if it meets the following conditions:"

> (1) Is handwritten or is in a typeface no smaller than 14-point type.
>
> (2) Is clearly separate from any other language present on the same page and is executed by a signature that serves no other purpose than to execute the authorization.
>
> (3) Is signed … and dated …
>
> (4) States the specific uses and limitations on the types of medical information to be disclosed.

[3] Subdivisions (b) and (c) are not relevant to this case but permit the disclosure of medical information in situations where a government investigation or lawsuit is taking place. For example, Defendant could bypass the authorization requirement if patient medical information was requested pursuant to a lawful court order or by a party to a proceeding before a court or administrative agency pursuant to a subpoena. *See* Cal. Civ. Code §§ 56.10(b)(3) and 56.10(b)(6).

> (5) States the name or functions of the provider of health care, health care service plan, pharmaceutical company, or contractor that may disclose the medical information.
>
> (6) States the name or functions of the persons or entities authorized to receive the medical information.
>
> (7) States the specific uses and limitations on the use of the medical information by the persons or entities authorized to receive the medical information.
>
> (8) States an expiration date or event. The expiration date or event shall limit the duration of the authorization to one year or less, unless the person signing the authorization requests a specific date beyond a year or unless the authorization is related to an approved clinical trial[.]
>
> (9) Advises the person signing the authorization of the right to receive a copy of the authorization.

Cal. Civ. Code § 56.11.

22. Additionally, "a provider of health care, health care service plan, contractor, or corporation and its subsidiaries and affiliates shall not intentionally share, sell, use for marketing, or otherwise use medical information for a purpose not necessary to provide health care services to the patient." Cal. Civ. Code § 56.10(d).

23. Moreover, a health care provider that maintains information for purposes covered by the CMIA is liable for negligent disclosures that arise as the result of an affirmative act—such as implementing a system that records and discloses online patients' PII and PHI. Cal. Civ. Code § 56.36(c).[4] Similarly, if a negligent release occurs and medical information concerning a patient is improperly viewed or otherwise accessed, the individual need not suffer actual damages. Cal. Civ. Code § 56.36(b).

---

[4] "Every provider of health care ... who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein. Any provider of health care ... who negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Section 56.36." Cal. Civ. Code § 56.101(a).

24. "In addition to any other remedies available at law, any individual may bring an action against any person or entity who has negligently released confidential information or records concerning him or her in violation of this part, for either or both of the following: (1) ... nominal damages of one thousand dollars ($1,000). In order to recover under this paragraph, it shall not be necessary that the plaintiff suffered or was threatened with actual damages. (2) The amount of actual damages, if any, sustained by the patient." Cal. Civ. Code § 56.36(b).

## III. The Federal Wiretap Act

25. The Federal Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986, makes it unlawful for a person to intentionally intercept, endeavor to intercept or procure any other person to intercept or endeavor to intercept any wire, oral or electronic communication. 18 U.S.C. § 2511(a).

26. Under the Federal Wiretap Act, "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of [the Federal Wiretap Act] may in a civil action recover from the person or entity . . . which engaged in that violation such relief as may be appropriate." 18 U.S.C. § 2520(a).

27. Persons who have been damaged due to the unauthorized interception, disclosure, and use of their confidential communications are entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiffs and any profits made by Defendant as a result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; (2) appropriate equitable or declaratory relief; and (3) reasonable attorneys' fees and other costs reasonably incurred.

//

//

//

## IV. Overview of Defendant's Website

28. Defendant facilitates a variety of online therapy and/or mental health digital services for its patients such as individual therapy, couples therapy, medication management, child or adolescent therapy, and family therapy.[5]

29. Defendant goes on to explain that "Alma connects you with clinicians who provide therapy for individuals, couples, families, children and adolescents, and medication management."[6]

30. Patients may connect with clinicians through "Alma's personalized search [which] helps [patients] find therapists based on" factors such as "[i]nsurance[,]" "[l]anguage[,]" "[i]dentity & therapy style[,]" and "more[.]"[7] *See also infra* ¶¶ 42-52.

31. Patients can book consultations with providers to access therapy services through Defendant's Website, without ever leaving home.

32. Unbeknownst to Plaintiff and Class Members, however, Defendant aids, agrees with, employs, and otherwise enables Google to eavesdrop on those confidential communications using Google's wiretaps, as set out *infra*.

33. Defendant has integrated Google's wiretaps into the Website. Through the integration of Google's tracking technology,[8] Defendant assisted Google with intercepting and

---

[5] *See* ALMA, *Find the provider who's right for you*, https://secure.helloalma.com/providers-landing (last accessed Sept. 9, 2025).

[6] ALMA, *Frequently Asked Questions*, https://helloalma.com/faq/ (last accessed Sept. 9, 2025).

[7] ALMA, *How It Works*, https://helloalma.com/how-it-works/ (last accessed Sept. 9, 2025).

[8] *See, e.g.*, GOOGLE, HOW GOOGLE ANALYTICS WORKS, https://support.google.com/analytics/ answer/12159447; GOOGLE, START LEARNING ABOUT GOOGLE ANALYTICS, https://developers.google.com/analytics; *see also* GOOGLE, [GA4] ACTIVATE GOOGLE SIGNALS FOR GOOGLE ANALYTICS PROPERTIES, https://support.google.com/analytics/answer/9445345; GOOGLE, [UA] ACTIVATE GOOGLE SIGNALS [LEGACY], https://support.google.com/analytics/answer/7532985; GOOGLE, [GA4] PREDEFINED USER DIMENSIONS, https://support.google.com/analytics/answer/9268042 ("Google signals is data from users who sign in to Google. When Google signals data is available, Analytics associates event data it collects from users with the Google accounts of users who are signed in[.]").

otherwise obtaining the identities and online activity of Defendant's patients, including information related to the type of mental health treatment patients were seeking and for which they booked consultations.

34. Website users' confidential communications are the product of users affirmatively entering, and interacting with, information on the Website (*i.e.*, the confidential communications are not procedurally or automatically generated). Instead, as set out below, the confidential communications stem from users conveying responses to questions and prompts, and actively making other selections. All of the foregoing is information created through the intent of Website users, *e.g.*: (1) information created by and in response to users' communicative inputs; (2) information created by and in response to users' intended messages to the Website, and Defendant; and (3) information created by the Website in response to users' having conveyed and expressed their respective desires that the Website would supply them with certain, highly personalized, types of information and/or responses. Google, as installed and integrated by Defendant, contemporaneously intercepts Website users' button clicks selecting such services.

35. When a patient enters helloalma.com[9] they are prompted to "[f]ind a therapist." *See* Screen 1.




**"Screen 1"**

[9] The consultation booking flow process that Plaintiff viewed was substantially similar as that depicted in this complaint.

36. Next, patients are prompted to "[f]ind the provider who's right for you." To do so, users can select the type of therapy they are "looking for[,]" including "[i]ndividual therapy," "[c]ouples therapy," "[m]edication management," "[c]hild or adolescent therapy," or "[f]amily therapy." *See* Screen 2.




**"Screen 2"**

37. If users had selected "[i]ndividual therapy," users are prompted to select "up to three areas you'd like to focus on" with a provider from a drop-down list. *See* Screen 3.




**"Screen 3"**

38. Users are next asked to select "[w]hat approach would you like your provider to take during your sessions" and click "[n]ext." *See* Screen 4A ("Please select all that apply"). Users can also click "[m]ore options" in order to see more options. *See* Screens 4A and 4B.




**"Screen 4A"**




**"Screen 4B"**

39. Afterwards, users are prompted to choose "any preferences" they may have "when it comes to [their] provider's identity[.]" Users' provider identity preferences include "faith," "gender identity," "race or ethnicity," "sexuality," or "I don't have a preference." *See* Screen 5.




**"Screen 5"**

40. If users had selected "faith" as a provider identity preference, users are prompted to select "all [preferences for your provider's faith] that apply." *See* Screen 6. For example, users can select they prefer their provider be "Christian." *See id.*




**"Screen 6"**

41. And if users had selected "gender identity" as a provider identity preference, users are additionally asked to choose one or more of "[f]emale," "[m]ale," "[n]on-binary," or "I don't have a preference." *See* Screen 7.




**"Screen 7"**

42. Next, users are asked whether they "prefer that [their] provider identify as transgender[.]" Users must click either "[y]es" or "I don't have a preference." *See* Screen 8.




**"Screen 8"**

43. Patients can also choose whether they want to "meet with [their] provider" "[v]irtually" or "[i]n-person." *See* Screen 9.




**"Screen 9"**

44. Next, patients share "[w]here [they] are located" so Alma can "find providers who are licensed in your area." *See* Screen 10A. "A provider needs to be licensed in the state you're located in when sessions are happening." *See* Screen 10B.




**"Screen 10A"**




**"Screen 10B"**

45. Then, Defendant asks "[h]ow are you planning to pay?" *See* Screen 11. Users can click to "[p]ay with insurance," "Employee Assistance Program," or "[o]ut of pocket." *See id*. If users choose to pay out of pocket, Defendant additionally asks users "[h]ow much can you pay for out of pocket sessions?" *See* Screen 12. After selecting their budget users click "See my results." *See id.*




**"Screen 11"**




**"Screen 12"**

46. Afterwards, users may be provided with a list of "[p]roviders in [their location] accepting out-of-pocket." *See* Screen 13A. And even if Alma "couldn't find an exact match" based on the criteria provided by a website user (*see supra* ¶¶ 41-51), website users can "update [their website] filters to see more options." In other words, users may de-select and/or select different "filters" to see more options. *See* Screen 13B. Alternatively, website users can simply select a provider from a recommended list of "other providers who might meet your needs[.]" *See* Screen 13A.




"Screen 13A"




"Screen 13B"

47. In any event, users receive an exact match or are paired with a provider through the recommended list of providers can click on "[v]iew profile" to view a particular provider's profile. *See* Screen 14.




**"Screen 14"**

//

//

//

//

//

//

//

//

//

//

48. Once on a particular provider page, users can read more about that provider, including but not limited to their unique "path to becoming a mental health provider." *See* Screen 15A; *see also* Screen 15B ("As a Latino male, I witnessed firsthand how stigma and systemic barriers led to the underutilization of mental health services in underserved communities."). On this same page, users have the option to book a consultation with a particular provider by clicking on "[b]ook consultation." *See* Screens 15A and 15B.




**"Screen 15A"**




**"Screen 15B"**

49. To finish booking their consultation, users need to "[a]nswer a few questions so" the provider they selected "can get in touch" with them. *See* Screen 16A ("Answer a few questions so [the provider] can get in touch."). First, users are asked to select a consultation time, or, "[i]f none of these times work, [users] leave this section blank and [the provider] will reach out to schedule a consultation." *See id.* Next, users provide their name, email, phone number, payment method, city or zip code, and whether they want to meet virtually or in-person. *See* Screen 16B. Patients may also "[s]hare a few sentences about the type of care" they are "looking for, the things [they would] like to focus on with a provider, and any previous experience [they] might have with therapy." *See* Screen 17. Finally, users click "[b]ook a consultation" to book their consultation. *See id.*




**"Screen 16A"**




"Screen 16B"




"Screen 16C"




"Screen 17"

50. Once users book a consultation, the provider reaches out to them directly. *See Screen* 17 ("You can expect to hear from [the provider] in a few days.").

## V. Google's Tracking Technology

### A. Background

51. Google wiretaps the Website with its tracking technologies, which Defendant purposefully installed on the Website.

52. Google's tracking technologies send secret instructions to a Website user's browser, without alerting the individual that this is happening. The trackers then cause the browser to secretly and simultaneously duplicate the user's Website communications, transmitting these communications to Google's servers alongside additional information about the Website user's identity. This entire process occurs within milliseconds. In other words, when a user communicates with Defendant's Website, those communications are simultaneously and contemporaneously duplicated and sent to Google at the same time as they are being sent to Defendant. Thus, Google's interception of these communications occurs "in transit." *See, e.g.*, *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020) ("Permitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion…"); *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019) ("Even if the browser caused a parallel signal to be sent to NaviStone, that intervention happened while the signal was already in transit from Revitch's device. Section 631's protections extend explicitly to the beginnings and ends of communications…"); *James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 961-62 (N.D. Cal. 2023) (finding in-transit interception was alleged based on similar process to the one alleged herein).

### B. Google Analytics

53. Google wiretaps the Website with trackers associated with "Google Analytics."[10] According to Google, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[11] "To measure a website … [one] add[s] a small piece of JavaScript measurement code to each page on [a] site."[12] Then, "[e]very time a user visits a webpage, the tracking code will collect … information about how that user interacted with the page."[13] Specifically, Google Analytics tracks "events"; "sessions"; and "users[.]"[14]

54. "Events let [clients] measure … when someone loads a page, clicks a link, [] makes a purchase[]" and more.[15] Google provides a menu of "recommended events" (i.e., "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; "views their shopping cart")[16] and also allows for "collect[ing] additional information that Google Analytics does not collect automatically[,]" through "custom events."[17]

55. A "session" is "the period from when a user visits [a] website or app to when they leave [said] website or app[.][18] "When a session starts, Google automatically collects a

---

[10] GOOGLE, START LEARNING ABOUT GOOGLE ANALYTICS, https://developers.google.com/analytics.

[11] GOOGLE, HOW GOOGLE ANALYTICS WORKS, https://support.google.com/analytics/answer/12159447.

[12] *Id.*

[13] *Id.*

[14] GOOGLE, TRAFFIC-SOURCE DIMENSIONS, https://support.google.com/analytics/answer/11080067.

[15] GOOGLE, SET UP EVENTS, https://developers.google.com/analytics/devguides/collection/ga4/events.

[16] GOOGLE, [GA4] RECOMMENDED EVENTS, https://support.google.com/analytics/answer/9267735.

[17] GOOGLE, [GA4] CUSTOM EVENTS, https://support.google.com/analytics/answer/12229021.

[18] GOOGLE, TRAFFIC-SOURCE DIMENSIONS, https://support.google.com/analytics/answer/11080067.

session_start event and generates a session ID (ga_session_id) and session number (ga_session_number)[.]"[19]

56. Finally, to discern when "two different [users] interact with [a] website[,] … Google Analytics identifies an individual user based on [Google Analytics] reporting identit[ies.]"[20] Reporting identities are combinations of "identifiers … called *identity spaces*" – namely, "User-ID"; "user-provided data"; "device ID"; and "modeling[.]"[21]

- A "User-ID" is a "persistent ID[,]"[22] consisting of a unique combination of up to "256 characters[,]"that is created by website operators and "assign[ed] and consistently reassign[ed] … to [] users[,] … typically [] during login."[23]

- "User-provided data" consists of contact details such as "email, phone, name and address[,]" provided by website users, that "is [] matched with other Google data … to improve the accuracy of [] measurement data and power enhanced Analytics capabilities."[24] Although these personal details are "hashed,"[25] the reality is that, even in hashed form, they are traceable to individuals.[26]

---

[19] GOOGLE, [GA4] ABOUT ANALYTICS SESSIONS, https://support.google.com/analytics/answer/9191807.

[20] GOOGLE, TRAFFIC-SOURCE DIMENSIONS, https://support.google.com/analytics/answer/11080067.

[21] GOOGLE, [GA4] REPORTING IDENTITIES, https://support.google.com/analytics/answer/10976610.

[22] *Id.*

[23] GOOGLE, [GA4] MEASURE ACTIVITY ACROSS PLATFORMS WITH USER-ID, https://support.google.com/analytics/answer/9213390.

[24] GOOGLE, [GA4] USER-PROVIDED DATA COLLECTION, https://support.google.com/analytics/answer/14077171.

[25] *Id.*

[26] *See, e.g.*, FEDERAL TRADE COMMISSION, DOES HASHING MAKE DATA "ANONYMOUS"?, https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2012/04/does-hashing-make-data-anonymous ("[H]ashing is vastly overrated as an 'anonymization' technique … the casual assumption that hashing is sufficient to anonymize data is risky at best, and usually wrong."); FEDERAL TRADE COMMISSION, NO, HASHING STILL DOESN'T MAKE YOUR DATA ANONYMOUS, https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-still-doesnt-make-your-data-anonymous ("[H]ashes aren't 'anonymous' and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized."); Steven Englehardt et al., I NEVER SIGNED UP FOR THIS! PRIVACY IMPLICATIONS OF EMAIL TRACKING, at 122, available at

- A "device ID" is a "browser-based or mobile-app-based identifier[.]"[27] "On a website, device ID gets its value from the client ID property of the _ga cookie. In an iOS or Firebase app, device ID gets its value from the app-instance ID, which identifies a unique installation of the app."[28]

- "Modeling" uses "machine learning to model the behavior of users who decline analytics cookies based on the behavior of similar users who accept analytics cookies."[29]

57. Google Analytics can also leverage "Google signals," which "associates [data] with user[s'] … Google accounts," for "users who have signed in … and who have turned on Ads Personalization."[30] Thus, with Google Signals, "Google is able to develop a holistic view of how those users interact with an online property from multiple browsers and multiple devices. For example, [one] can see how users browse products on [a] site from a phone, and later return to complete purchases from a tablet or laptop."[31]

//

//

//

//

//

https://petsymposium.org/2018/files/papers/issue1/paper42-2018-1-source.pdf ("[H]ashing of PII, including emails, is not a meaningful privacy protection. This is folk knowledge in the security community, but bears repeating."); MARTECH, FTC PRIVACYCON: YOUR EMAIL ADDRESS IS LEAKING AND VULNERABLE, https://martech.org/ftc-privacycon-email-address-leaking-vulnerable ("Hashing is an algorithmic process that turns [information] into a gibberish label[.] … Although gibberish, it's unique, so it can be employed as an anonymized identifier. It's supposed to be one-way, meaning that you can't turn the gibberish back into the [original form]. Wrong, says Englehardt and his colleagues.").

[27] GOOGLE, [GA4] DEVICE ID, https://support.google.com/analytics/answer/9356035.

[28] *Id.*

[29] GOOGLE, [GA4] BEHAVIORAL MODELING FOR CONSENT MODE, https://support.google.com/analytics/answer/11161109.

[30] GOOGLE, [GA4] ACTIVATE GOOGLE SIGNALS FOR GOOGLE ANALYTICS PROPERTIES, https://support.google.com/analytics/answer/9445345.

[31] *Id.*

## VI. Defendant Aids, Agrees With, Employs, and Otherwise Enables Google to Wiretap Californians' Communications

58. Google, as enabled by Defendant, contemporaneously intercepts and/or otherwise obtains the following communications of users of Defendant's Website. The highlights in the below transmissions show communications on the Website.

59. As shown by the highlights in the below screenshots of Website transmissions, Google intercepts and/or otherwise obtains the fact that users clicked to find a therapist (here, "Find a Therapist Who's Right for You - Alma"). These communications are the product of button clicks on Screen 1.

| | |
|---|---|
| Request URL | https://analytics.google.com/g/collect?v=2&tid=G-R0Z6J0E1GE&gtm=45je5991v9101100493za200zd9101100493&_p=1757599441881&gcd=13l3l3l3l1l1&npa=0&dma=0&cid=1714290763.1755718964&ul=en-us&sr=1920x1080&ir=1&uaa=x86&uab=64&uafvl=Chromium%3B140.0.7339.128%7CNot%253DA%253FBrand%3B24.0.0.0%7CGoogle%2520Chrome%3B140.0.7339.128&uamb=0&uam=&uap=Windows&uapv=19.0.0&uaw=0&are=1&frm=0&pscdl=noapi&_eu=EAAAAAQ&_s=1&tag_exp=101509157~103116026~103200004~103233427~104527907~104528500~104684208~104684211~104948813~105367987~105367989~105424848~105426769~105426771&sid=1757597854&sct=9&seg=1&dl=https%3A%2F%2Fsecure.helloalma.com%2Fproviders-landing%2F%3F_gl%3D1*1t69zz9*_ga*MTcxNDI5MDc2My4xNzU1NzE4OTY0*_ga_R0Z6J0E1GE*czE3NTc1OTc4NTQkbzkkZzEkdDE3NTc1OTk0MjUkajQ3JGwwJGgw&dt=Find%20a%20Therapist%20Who%27s%20Right%20for%20You%20-%20Alma&en=page_view&_ee=1&ep.ga_cookie_id=GA1.1.1714290763.1755718964&tfd=5636 |

| | |
|---|---|
| dl | https://secure.helloalma.com/providers-landing/?_gl=1*1t69zz9*_ga*MTcxNDI5MDc2My4xNzU1NzE4OTY0*_ga_R0Z6J0E1GE*czE3NTc1OTc4NTQkbzkkZzEkdDE3NTc1OTk0MjUkajQ3JGwwJGgw |
| dt | Find a Therapist Who's Right for You - Alma |
| en | page_view |

//

//

//

//

//

//

//

60. As shown by the highlights in the below screenshots of the Website transmissions, Google also intercepts and/or otherwise obtains the location selected by a user by means of a Google Place ID (here, "ChlJHfsmlgbJwoARADaMiO5XZPM"). These communications are the product of button clicks on Screens 10A and 10B.

| | |
|---|---|
| Request URL | https://maps.googleapis.com/maps/api/place/js/PlaceService.GetPlaceDetails?2sen-US&10e3&14m1&1sChlJHfsmlgbJwoARADaMiO5XZPM&15sDF923F5D501744A0BECC8C19D0EBBE457bau&16m1&1sgeometry%2Cformatted_address%2Caddress_components&17m1&2e1&r_url=https%3A%2F%2Fsecure.helloalma.com%2Fproviders-landing%2F&callback=_xdc_._mt7zuf&key=AlzaSyDZAoKFxJUcFKyltxs2HLYJRp5_CgFx3eg&token=9675 |

61. Google says that "Place IDs uniquely identify a place in the Google Places database and on Google Maps."[32] Here, the Place ID "ChIJHfsmIgbJwoARADaMiO5XZPM" intercepted by Google corresponds to Los Angeles, CA 90001.




32 GOOGLE, *Place IDs*, https://developers.google.com/maps/documentation/places/web-service/place-id (last accessed Sept. 11, 2025).

62. As shown by the highlights in the below screenshots of the Website transmissions, Google further intercepts and/or otherwise obtains the provider identity preferences selected by users. Specifically, Google intercepts and/or otherwise obtains the type of therapy a user is looking for (here, "individual"), areas users want to focus on (here, "depression" and "general" as in general mental health), the approach they want their provider to take in therapy (here, "trauma_focused"), preferences as to their provider's faith and gender identity (here, "Christian" and "non_binary"), where they are seeking therapy (here, "Los…Angeles"), that they are seeking virtual care (here, "teletherapy_preference_online"), and how the user plans to pay (here, "payment_out_of_pocket"). These communications are delivered in Base64 language and are the product of button clicks on Screens 2, 3, 4B, 5-7, 9, 10A-10B, 11. The original and decoded versions are displayed below.

https://secure.helloalma.com/recommendations/?filterables=cGF5bWVudF9vdXRfb2ZfcG9ja2V0JTJDcmF0ZV80JTJDc3BlY2lhbHR5X3YyX2RlcHJlc3Npb24lMkNzcGVjaWFsdHlfdjJfZ2VuZXJhbCUyQ21vZGFsaXR5X2NvZ25pdGl2ZV9wcm9jZXNzaW5nX3RoZXJhcHklMkNtb2RhbGl0eV9leWVfbW92ZW1lbnRfZGVzZW5zaXRpemF0aW9uJTJDbW9kYWxpdHlfcHJvbG9uZ2VkX2V4cG9zdXJlX3BlJTJDbW9kYWxpdHlfdHJhdW1hX2ZvY3VzZWRfY29nbml0aXZlX2JlaGF2aW9yX3RoZXJhcHklMkN0ZWxldGhlcmFweV9wcmVmZXJlbmNlX29ubGluZSUyQ3NlcnZpY2VfaW5kaXZpZHVhbCUyQ2lkZW50aXR5X2ZhaXRoX2NocmlzdGlhbiUyQ2lkZW50aXR5X2dlbmRlcl9ub25fYmluYXJ5&lt=MzMuOTY5Nzg5Nw==&lg=LTExOC4yNDY4MTQ4&ct=TG9zJTIwQW5nZWxlcw==&st=Q0E=&from_guided_path=true&from_recommended=true

**Original Base64 transmission**

↓

**payment_out_of_pocket**%2Crate_4%2Cspecialty_v2_**depression**%2Cspecialty_v2_**general**%2Cmodality_cognitive_processing_therapy%2Cmodality_eye_movement_desensitization%2Cmodality_prolonged_exposure_pe%2Cmodality_**trauma_focused**_cognitive_behavior_therapy%2C**teletherapy_preference_online**%2Cservice_**individual**%2C**identity_faith_christian**%2C**identity_gender_non_binary**ûË32ÒôcôsâôpûËéÒ#CcâCç-**Los%20Angeles**

**Decoded transmission**

-----------------------------------------------------------------------------------------------------------

https://secure.helloalma.com/providers-results/ca/out-of-pocket?filterables=c2VydmljZV9pbmRpdmlkdWFsJTJDc3BlY2lhbHR5X3YyX2RlcHJlc3Npb24lMkNzcGVjaWFsdHlfdjJfZ2VuZXJhbCUyQ3BheW1lbnRfb3V0X29mX3BvY2tldCUyQ3JhdGVfNCUyQ2lkZW50aXR5X2dlbmRlcl9ub25fYmluYXJ5JTJDaWRlbnRpdHlfZmFpdGhfY2hyaXN0aWFuJTJDdGVsZXRoZXJhcHlfcHJlZmVyZW5jZV9vbmxpbmUlMkNtb2RhbGl0eV9jb2duaXRpdmVfcHJvY2Vzc2luZ190aGVyYXB5JTJDbW9kYWxpdHlfZXllX21vdmVtZW50X2Rlc2Vuc2l0aXphdGlvbiUyQ21vZGFsaXR5X3Byb2xvbmdlZF9leHBvc3VyZV9wZSUyQ21vZGFsaXR5X3RyYXVtYV9mb2N1c2VkX2NvZ25pdGl2ZV9iZWhhdmlvcl90aGVyYXB5&lt=MzMuOTY5Nzg5Nw%3D%3D&lg=LTExOC4yNDY4MTQ4&ct=TG9zJTIwQW5nZWxlcw%3D%3D&st=Q0E%3D&from_guided_path=true&from_recommended=true

**Original Base64 transmission**

↓

service_**individual**%2Cspecialty_v2_**depression**%2Cspecialty_v2_**general**%2C**payment_out_of_pocket**%2Crate_4%2C**identity_gender_non_binary**%2C**identity_faith_christian**%2C**teletherapy_preference_online**%2Cmodality_cognitive_processing_therapy%2Cmodality_eye_movement_desensitization%2Cmodality_prolonged_exposure_pe%2Cmodality_**trauma_focused**_cognitive_behavior_therapy–Ó32ã"c"sƒ"pÜ=Ã–Ó,ã#CcƒC‡-**Los%20Angeles**
ÃÜ

**Decoded transmission**

63. Base64 is a computer language known as "Hacker Pig Latin."[33] This computer language is designed to carry and easily transfer data between sources by compressing the data into a simple, long string of plain text. Unfortunately for the privacy rights of Alma users, by publishing the provider options in Base64 instead of encrypting this information, Defendant makes consumer's identity preferences readily translatable into English. Just as any ordinary person can cut-and-paste Spanish text into Google Translate to figure out what it means in English, any ordinary person can cut and paste Base64 text into any one of a myriad of Base64 decoding websites and figure out what the Base64 text means. Therefore, even though Defendant shares Plaintiff's and Class Members' provider preferences with Google in Base64, the identity preferences addresses are personally identifiable information because the email addresses are easily translated into English and can be used to identify a subscriber.

//

//

//

//

//

//

//

//

//

//

[33] Daniel Smallwood, *Hacker Pig Latin: A Base64 Primer for Security Analysts*, DARK READING (Jan. 21, 2021), available at https://www.darkreading.com/cybersecurity-analytics/hacker-pig-latina-base64-primer-for-security-analysts (last accessed Dec. 19, 2023).

64. As shown by the highlights in the below screenshots of the Website transmissions, Google also intercepts and/or otherwise obtains the particular clinician that a user chooses to schedule a consultation with, by means of the clinician's name (here, "[L]uis…[E]fren…[A]guilar"). Google also intercepts and/or otherwise obtains that the user selected this particular clinician "from…[the ]recommended" list of providers. These communications are the product of button clicks on Screen 14.


| | |
|---|---|
| Request URL | https://analytics.google.com/g/collect?v=2&tid=G-R0Z6J0E1GE&gtm=45je5991v9101100493za200zd9101100493&_p=1757603971771&gcd=13l3l3l3l1l1&npa=0&dma=0&cid=1714290763.1755718964&ul=en-us&sr=1920x1080&uaa=x86&uab=64&uafvl=Chromium%3B140.0.7339.128%7CNot%253DA%253FBrand%3B24.0.0.0%7CGoogle%2520Chrome%3B140.0.7339.128&uamb=0&uam=&uap=Windows&uapv=19.0.0&uaw=0&are=1&frm=0&pscdl=noapi&_eu=AAAAAAQ&tag_exp=101509157~103116026~103200004~103233427~104527906~104528500~104684208~104684211~104948813~105367987~105367989~105426769~105426771&sid=1757603898&sct=10&seg=1&dl=https%3A%2F%2Fsecure.helloalma.com%2Fproviders%2Fluis-efren-aguilar%2F%3Ffilterables%3Dc2VydmljZV9pbmRpdmlkdWFsJTJDc3BlY2lhbHR5X3YyX2RlcHJlc3Npb24lMkNzcGVjaWFsdHlfdjJfZ2VuZXJhbCUyQ3BheW1lbnRfb3V0X29mX3BvY2tldCUyQ3JhdGVfNCUyQ2lkZW50aXR5X2dlbmRlcl9ub25fYmluYXJ5JTJDaWRlbnRpdHlfZmFpdGhfY2hyaXN0aWFuJTJDdGVsZXRoZXJhcHlfcHJlZmVyZW5jZV9vbmxpbmUlMkNtb2RhbGl0eV9jb2duaXRpdmVfcHJvY2Vzc2luZ190aGVyYXB5JTJDbW9kYWxpdHlfZXllX21vdmVtZW50X2Rlc2Vuc2l0aXphdGlvbiUyQ21vZGFsaXR5X3Byb2xvbmdlZF9leHBvc3VyZV9wZSUyQ21vZGFsaXR5X3RyYXVtYV9mb2N1c2VkX2NvZ25pdGl2ZV9iZWhhdmlvcl90aGVyYXB5%26lt%3DMzMuOTY5Nzg5Nw%253D%253D%26lg%3DLTExOC4yNDY4MTQ4%26ct%3DTG9zJTIwQW5nZWxlcw%253D%253D%26st%3DQ0E%253D%26from_guided_path%3Dtrue%26from_recommended%3Dtrue&dr=https%3A%2F%2Fsecure.helloalma.com%2Fproviders-results%2Fca%2Fout-of-pocket%3Ffilterables%3Dc2VydmljZV9pbmRpdmlkdWFsJTJDc3BlY2lhbHR5X3YyX2RlcHJlc3Npb24lMkNzcGVjaWFsdHlfdjJfZ2VuZXJhbCUyQ3BheW1lbnRfb3V0X29mX3BvY2tldCUyQ3JhdGVfNCUyQ2lkZW50aXR5X2dlbmRlcl9ub25fYmluYXJ5JTJDaWRlbnRpdHlfZmFpdGhfY2hyaXN0aWFuJTJDdGVsZXRoZXJhcHlfcHJlZmVyZW5jZV9vbmxpbmUlMkNtb2RhbGl0eV9jb2duaXRpdmVfcHJvY2Vzc2luZ190aGVyYXB5JTJDbW9kYWxpdHlfZXllX21vdmVtZW50X2Rlc2Vuc2l0aXphdGlvbiUyQ21vZGFsaXR5X3Byb2xvbmdlZF9leHBvc3VyZV9wZSUyQ21vZGFsaXR5X3RyYXVtYV9mb2N1c2VkX2NvZ25pdGl2ZV9iZWhhdmlvcl90aGVyYXB5%26lt%3DMzMuOTY5Nzg5Nw%253D%253D%26lg%3DLTExOC4yNDY4MTQ4%26ct%3DTG9zJTIwQW5nZWxlcw%253D%253D%26st%3DQ0E%253D%26from_guided_path%3Dtrue%26from_recommended%3Dtrue&dt=Luis%20Efren%20Aguilar%20-%20Alma&_s=2&tfd=34047 |



| | |
|---|---|
| dl | https%3A%2F%2Fsecure.helloalma.com%2Fproviders%2Fluis-efren-aguilar%2F%3Ffilterables%3Dc2VydmljZV9pbmRpdmlkdWFsJTJDc3BlY2lhbHR5X3YyX2RlcHJlc3Npb24lMkNzcGVjaWFsdHlfdjJfZ2VuZXJhbCUyQ3BheW1lbnRfb3V0X29mX3BvY2tldCUyQ3JhdGVfNCUyQ2lkZW50aXR5X2dlbmRlcl9ub25fYmluYXJ5JTJDaWRlbnRpdHlfZmFpdGhfY2hyaXN0aWFuJTJDdGVsZXRoZXJhcHlfcHJlZmVyZW5jZV9vbmxpbmUlMkNtb2RhbGl0eV9jb2duaXRpdmVfcHJvY2Vzc2luZ190aGVyYXB5JTJDbW9kYWxpdHlfZXllX21vdmVtZW50X2Rlc2Vuc2l0aXphdGlvbiUyQ21vZGFsaXR5X3Byb2xvbmdlZF9leHBvc3VyZV9wZSUyQ21vZGFsaXR5X3RyYXVtYV9mb2N1c2VkX2NvZ25pdGl2ZV9iZWhhdmlvcl90aGVyYXB5%26lt%3DMzMuOTY5Nzg5Nw%253D%253D%26lg%3DLTExOC4yNDY4MTQ4%26ct%3DTG9zJTIwQW5nZWxlcw%253D%253D%26st%3DQ0E%253D%26from_guided_path%3Dtrue%26from_recommended%3Dtrue |
| dr | https%3A%2F%2Fsecure.helloalma.com%2Fproviders-results%2Fca%2Fout-of-pocket%3Ffilterables%3Dc2VydmljZV9pbmRpdmlkdWFsJTJDc3BlY2lhbHR5X3YyX2RlcHJlc3Npb24lMkNzcGVjaWFsdHlfdjJfZ2VuZXJhbCUyQ3BheW1lbnRfb3V0X29mX3BvY2tldCUyQ3JhdGVfNCUyQ2lkZW50aXR5X2dlbmRlcl9ub25fYmluYXJ5JTJDaWRlbnRpdHlfZmFpdGhfY2hyaXN0aWFuJTJDdGVsZXRoZXJhcHlfcHJlZmVyZW5jZV9vbmxpbmUlMkNtb2RhbGl0eV9jb2duaXRpdmVfcHJvY2Vzc2luZ190aGVyYXB5JTJDbW9kYWxpdHlfZXllX21vdmVtZW50X2Rlc2Vuc2l0aXphdGlvbiUyQ21vZGFsaXR5X3Byb2xvbmdlZF9leHBvc3VyZV9wZSUyQ21vZGFsaXR5X3RyYXVtYV9mb2N1c2VkX2NvZ25pdGl2ZV9iZWhhdmlvcl90aGVyYXB5%26lt%3DMzMuOTY5Nzg5Nw%253D%253D%26lg%3DLTExOC4yNDY4MTQ4%26ct%3DTG9zJTIwQW5nZWxlcw%253D%253D%26st%3DQ0E%253D%26from_guided_path%3Dtrue%26from_recommended%3Dtrue |
| dt | Luis%20Efren%20Aguilar%20-%20Alma |


//

//

//

//

//

65. As shown by the highlights in the below screenshot of the Website transmissions, Google also intercepts and/or otherwise obtains communications regarding users completing their consultation booking (here, "consultation_request_form_submit"). These communications are the product of button clicks on Screen 16C. As explained *supra* ¶ 70, although certain portions of users' booking confirmation data is in Base64, this data is easily translated into English. *See* below.






66. Google's intercepts or otherwise obtains these communications regarding users' completing their consultation bookings via its reCAPTCHA technology. While most people understand Google reCAPTCHA as "[o]stensibly designed to differentiate humans from bots," "beneath [the] surface ... lies a complex web of privacy concerns that warrant a closer examination."[34] Indeed, "Google's reCAPTCHA, ... collects extensive user data, including IP addresses, browser information, and even behavioral patterns, ostensibly to enhance its security mechanisms. However, this data collection serves dual purposes, feeding into Google's vast data reservoirs for purposes that may extend beyond mere authentication security."[35]

67. In other words, with reCAPTCHA, Google "hides in the background, ***watching everything you do before, during, and after you interact with it. The system places emphasis on identifying who the user is***, rather than simply determining if the user is human."[36] And one study says that "[i]t can be concluded that the true purpose of reCAPTCHAv2 is as a tracking cookie farm for advertising profit masquerading as a security service."[37]

68. Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to disclose her PII, PHI, and/or other communications. Moreover, Plaintiff was never provided with the required notice that Defendant disclosed the PHI of users of the Website, nor was she provided any means of opting out of such disclosures. Defendant nonetheless knowingly disclosed Plaintiff's PHI to Google.

---

[34] Hugh Parry, *Google reCAPTCHA is a privacy nightmare - Questions over privacy promises and cookie use*, PROSOPO, https://prosopo.io/blog/google-privacy-nightmare/ (last accessed Sept. 11, 2025).

[35] *Id.*

[36] FRANK'S WORLD, *Can reCAPTCHA Actually Be Spyware?*, https://www.franksworld.com/2024/12/09/can-recaptcha-actually-be-spyware/ (emphasis added).

[37] Andrew Searles et. al., *Dazed & Confused: A Large-Scale Real-World User Study of reCAPTCHAv2* (Nov. 2023), at 13, available at https://doi.org/10.48550/arXiv.2311.10911; *see also id.* ("The expenditure on third-party audience data (collected using tracking cookies) in the United States reached from $15.9 billion in 2017 to $22 billion in 2021").

69. By law, Plaintiff is entitled to privacy in her PHI and confidential communications. Defendant deprived Plaintiff of her privacy rights when it: (1) implemented a system that surreptitiously tracked, recorded, and disclosed Plaintiff's and other online patients' confidential communications, PII, and PHI; (2) disclosed patients' PHI to Google—an unauthorized third-party eavesdropper; and (3) undertook this pattern of conduct without notifying Plaintiff and without obtaining her express written consent. As explained in more detail *infra* § VIII, Plaintiff did not discover that Defendant disclosed her PII, PHI, and other communications to Google, and assisted Google with intercepting her communications, until September 2025.

## VII. Defendant Enables Google to Pair the Above Data with Users' Identities

70. As discussed *supra*, § V, the Google tracking technologies at issue can pair wiretapped data with website users' identities.

71. To do so, the Google Analytics identity spaces and Google signals rely, at least in part, on Google cookies.[38] A cookie is a "small text file (up to 4KB) created by a website that is stored in the user's computer either temporarily for that session only or permanently in storage (persistent cookie)."[39] Persistent cookies can be used to "track user behavior across different sites. They store information such as geographic location, device specifications, and specific actions taken on the website."[40] Thus, together, the Google cookies allow Google Analytics to "'remember' what a user has done on previous pages [and their] interactions with the [W]ebsite."[41]

[38] *See, e.g.*, GOOGLE, OUR ADVERTISING AND MEASUREMENT COOKIES, https://business.safety.google/adscookies/; GOOGLE, GOOGLE ANALYTICS COOKIE USAGE ON WEBSITES, https://web.archive.org/web/20240303080533/https://developers.google.com/analytics/devguides/collection/analyticsjs/cookie-usage; OPEN COOKIE DATABASE, https://jkwakman.github.io/Open-Cookie-Database/open-cookie-database.html.

[39] PC MAGAZINE, COOKIE TABLE, https://www.pcmag.com/encyclopedia/term/cookie.

[40] COOKIEBOT, WHAT ARE TRACKING COOKIES AND HOW DO THEY WORK?, https://www.cookiebot.com/en/tracking-cookies/.

[41] GOOGLE, GOOGLE ANALYTICS COOKIE USAGE ON WEBSITES, https://web.archive.org/web/20240303080533/https://developers.google.com/analytics/devguides/collection/analyticsjs/cookie-usage.

72. The following image confirms that, when a user accesses the Website while logged into a Google account, the Google tracking technologies on the Website compel that user's browser to transmit several Google cookies, including the AEC; APISID; HSID; NID; SAPISID; SID; SSID; SIDCC; _ga; _Secure-1PAPISID; _Secure-1PSID; _Secure-1PSIDCC; _Secure-1PSIDTS; _Secure-3PAPISID; _Secure-3PSID; _Secure-3PSIDCC; _Secure-3PSIDTS; DV cookies:

| Name ▲ | Value | Domain | Path | Expires /... | Size | Http... | Secu... | Sam... | Parti... | Cr... | Priority |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AEC | [redacted] | .google.com | / | 2026-02... | 62 | ✓ | ✓ | Lax | | | Medium |
| APISID | [redacted] | .google.com | / | 2026-11... | 40 | | | | | | High |
| DV | [redacted] | www.google.com | / | 2025-09... | 49 | | | | | | Medium |
| HSID | [redacted] | .google.com | / | 2026-11... | 21 | ✓ | | | | | High |
| NID | [redacted] | .google.com | / | 2026-04... | 807 | ✓ | ✓ | None | | | Medium |
| SAPISID | [redacted] | .google.com | / | 2026-11... | 41 | | ✓ | | | | High |
| SID | [redacted] | .google.com | / | 2026-11... | 156 | | | | | | High |
| SIDCC | [redacted] | .google.com | / | 2026-09... | 77 | | | | | | High |
| SSID | [redacted] | .google.com | / | 2026-11... | 21 | ✓ | ✓ | | | | High |
| _Secure-1PAPISID | [redacted] | .google.com | / | 2026-11... | 51 | | ✓ | | | | High |
| _Secure-1PSID | [redacted] | .google.com | / | 2026-11... | 167 | ✓ | ✓ | | | | High |
| _Secure-1PSIDCC | [redacted] | .google.com | / | 2026-09... | 90 | ✓ | ✓ | | | | High |
| _Secure-1PSIDTS | [redacted] | .google.com | / | 2026-09... | 93 | ✓ | ✓ | | | | High |
| _Secure-3PAPISID | [redacted] | .google.com | / | 2026-11... | 51 | | ✓ | None | | | High |
| _Secure-3PSID | [redacted] | .google.com | / | 2026-11... | 167 | ✓ | ✓ | None | | | High |
| _Secure-3PSIDCC | [redacted] | .google.com | / | 2026-09... | 88 | ✓ | ✓ | None | | | High |
| _Secure-3PSIDTS | [redacted] | .google.com | / | 2026-09... | 93 | ✓ | ✓ | None | | | High |
| _ga | [redacted] | .helloalma.com | / | 2026-11... | 30 | | | | | | Medium |
| _ga_R0Z6J0E1GE | [redacted] | .helloalma.com | / | 2026-11... | 59 | | | | | | Medium |

73. The AEC cookie "ensure[s] that requests within a browsing session are made by the user, and not by other sites[,]" and has a lifespan on 6 months.[42]

74. The SSID; SIDCC; SID; SAPISID; HSID; APISID; are marketing cookies that, *inter alia*, "[a]djust[] the ads that appear in Google Search" and all have a lifespan of 2 years.

75. The NID marketing cookie "is used to collect website statistics and track conversion rates and Google ad personalization[,]" and has a lifespan of 1 year.

76. The DV marketing cookie "is used to collect website statistics and track conversion rates and Google ad personalisation" and has a lifespan of 1 year.[43]

---

[42] OPEN COOKIE DATABASE, https://jkwakman.github.io/Open-Cookie-Database/open-cookie-database.html.

[43] *Id.*

77. The _Secure-1PAPISID; _Secure-1PSID; _Secure-1PSIDCC; and _Secure-1PSIDTS cookies are "[t]argeting cookie[s u]sed to create a user profile and display relevant and personalised Google Ads to the user."[44] The _Secure-1PAPISID; _Secure-1PSID; _Secure-1PSIDCC; and _Secure-1PSIDTS cookies have a lifespan of 2 years.[45]

78. The _Secure-3PAPISID is a marketing cookie that "[p]rofiles the interests of website visitors to serve relevant and personalised ads through retargeting" and has a lifespan of 2 years.[46]

79. The _Secure-3PSID cookie is a "[t]argeting cookie[ u]sed to profile the interests of website visitors and display relevant and personalised Google ads" and has a lifespan of 2 years.[47]

80. The _Secure-3PSIDCC and _Secure-3PSIDTS cookies are "[t]argeting cookie[s u]sed to create a user profile and display relevant and personalised Google Ads to the user."[48] The _Secure-3PSIDCC and _Secure-3PSIDTS cookies have a lifespan of 2 years.[49]

81. The _ga cookie is an "ID used to identify users" and has a lifespan of 2 years.[50]

82. Even when a user accesses the Website while not logged into a Google account, the Google tracking technologies on the Website compel that user's browser to transmit several Google cookies, including the AEC; NID; _ga; and DV cookies:

| Name | Value | Dom... | Path | Expir... | Size | Http... | Secu... | Sam... | Parti... | Cros... | Prior... |
|---|---|---|---|---|---|---|---|---|---|---|---|
| _ga | [redacted] | .hell... | / | 2026... | 30 | | | | | | Med... |
| _ga_R0Z6J0E1GE | [redacted] | .hell... | / | 2026... | 59 | | | | | | Med... |
| AEC | [redacted] | .goo... | / | 2026... | 62 | ✓ | ✓ | Lax | | | Med... |
| DV | [redacted] | ww... | / | 2025... | 33 | | | | | | Med... |
| NID | [redacted] | .goo... | / | 2026... | 502 | ✓ | ✓ | None | | | Med... |

[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] *Id.*

83. Defendant also uses Google signals, which "associates [data] with user[s'] … Google accounts," for "users who have signed in … and who have turned on Ads Personalization."[51] The highlighted lines below show that Defendant enabled Google signals.

```
["map", "redactFieldGroup", "GOOGLE_SIGNALS", "disallowAllRegions", false, "disallowedRegions", ""]],
```

**VIII. Google Uses Californians' Data for its Own Purposes**

84. When Google uses its wiretaps on Website users' communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. Instead, Google – a separate and distinct entity from the parties to the conversations – uses the wiretaps to eavesdrop upon, record, extract data from, and analyze conversations to which it is not a party. Google itself, collects the contents of said conversations. That data is then analyzed by Google before being provided to any entity that was a party to the conversations (like Defendant).

85. Google has the capability to use the contents of conversations it collects through its wiretaps for its own purposes.

86. The "Google Analytics Terms of Service" make clear: "These Google Analytics Terms of Service (this 'Agreement') are entered into by Google LLC ('Google') and the entity executing this Agreement ('You'). This Agreement governs Your use of the standard Google Analytics (the 'Service'). BY CLICKING THE 'I ACCEPT' BUTTON, COMPLETING THE REGISTRATION PROCESS, OR USING THE SERVICE, YOU ACKNOWLEDGE THAT YOU HAVE REVIEWED AND ACCEPT THIS AGREEMENT AND ARE AUTHORIZED TO ACT ON BEHALF OF, AND BIND TO THIS AGREEMENT, THE OWNER OF THIS

---

[51] GOOGLE, [GA4] ACTIVATE GOOGLE SIGNALS FOR GOOGLE ANALYTICS PROPERTIES, https://support.google.com/analytics/answer/9445345; *see also* GOOGLE, [GA4] PREDEFINED USER DIMENSIONS, https://support.google.com/analytics/answer/9268042 ("Google signals is data from users who sign in to Google. When Google signals data is available, Analytics associates event data it collects from users with the Google accounts of users who are signed in[.]").

ACCOUNT."[52] In the "Google Analytics Terms of Service," Google further states: "You must disclose the use of Google Analytics, and how it collects and processes data. This can be done by displaying a prominent link to the site 'How Google uses information from sites or apps that use our services', (located at www.google.com/policies/privacy/partners/, or any other URL that Google may provide from time to time)."[53] Presently, www.google.com/policies/privacy/partners/ redirects to https://policies.google.com/technologies/partner-sites, in which Google specifies: "Google uses the information shared by sites and apps to deliver our services, maintain and improve them, develop new services, measure the effectiveness of advertising, protect against fraud and abuse, and personalize content and ads you see on Google and on our partners' sites and apps."[54] Thus, Google has the capability to use the wiretapped data for purposes other than simply providing a recording to Defendant, including, but not limited to, delivering, maintaining, improving, and developing Google's services; measuring the effectiveness of advertising; protecting against fraud and abuse; and personalizing content and ads.

## IX. Defendant Intentionally Installed Google's Tracking Technology

87. The code for the Google tracking technologies at issue did not spontaneously appear on the Website. Instead, Google's code was purposefully installed by Defendant into the HTML documents and/or other libraries defining the contents of the Website. Google explains: "To begin seeing data in your new Google Analytics 4 property, you'll need to do one of the following: Add the tag to a website builder or CMS-hosted website[;] … Add the Google tag directly to your web pages[;] … [or a]dd your tag using Google Tag Manager[.]"[55]

---

[52] GOOGLE, GOOGLE ANALYTICS TERMS OF SERVICE, https://marketingplatform.google.com/about/analytics/terms/us/.

[53] *Id.*

[54] GOOGLE, HOW GOOGLE USES INFORMATION FROM SITES OR APPS THAT USE OUR SERVICES, https://policies.google.com/technologies/partner-sites.

[55] GOOGLE, [GA4] SET UP ANALYTICS FOR A WEBSITE AND/OR APP, https://support.google.com/analytics/answer/9304153?hl=en#zippy=.

88. Defendant knows (and knew when integrating, embedding, and installing the Google tracking technologies) that Google was a separate and distinct entity from Alma, the Alma Website, the Alma consumers, and the Alma communications at issue.

89. Defendant knows (and knew when integrating, embedding, and installing the tracking technologies at issue) that Google uses its tracking technologies to eavesdrop upon and record Alma communications to which Google is not a party, and that Google thereby collects the contents of communications between Alma consumers and Alma.

90. Defendant knows (and knew when integrating, embedding, and installing the tracking technologies at issue) what, *inter alia*, the "Google Analytics Terms of Service" and webpages incorporated therein state regarding Google's use of the contents of the communications here at issue for Google's own, unlawful purposes. Specifically, Defendant knows (and knew when procuring the tracking technologies at issue) that Google has the capability to use the wiretapped data for purposes other than simply providing a recording to Defendant, including, but not limited to, delivering, maintaining, improving, and developing Google's services; measuring the effectiveness of advertising; protecting against fraud and abuse; and personalizing content and ads. Accordingly, Alma's aiding, agreeing with, and employment of Google's wiretapping was done knowingly, willfully, and intentionally.

**X. Tolling**

91. Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of its incorporation of Google Analytics into its website.

92. Google Analytics on Defendant's website was entirely invisible to a website visitor. Through no fault or lack of diligence, Plaintiff and Class Members were deceived and/or ignorant to information essential to pursue their claims, and thus could not reasonably discover Defendant's deception and/or unlawful conduct.

93. Defendant had exclusive knowledge that its Website incorporated Google Analytics yet failed to disclose to users, including Plaintiff and Class Members, that by scheduling a therapy consultation, Plaintiff's and Class Members' personal information would be disclosed or released to Google.

94. Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its users' personal information. In fact, to the present Defendant has not conceded, acknowledged, or otherwise indicated to its users that it has disclosed or released their personal information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

95. Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

96. The earliest that Plaintiff or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this Complaint.

97. Plaintiff first discovered that Defendant had collected and shared her personal information without her consent on or around September 2025 after contacting undersigned counsel and discussing potential claims against Defendant.

## CLASS ALLEGATIONS

98. Plaintiff seeks certification of the following class: all persons in the United States who, during the class period, had their PII and/or PHI improperly intercepted by or otherwise disclosed to Google, as a result of using the Website (the "Class" or "Nationwide Class").

99. Plaintiff also seeks to represent a subclass consisting of all California residents who, during the class period, had their PII and/or PHI improperly intercepted by or otherwise disclosed

to Google, as a result of using the Website (the "Subclass" or "California Subclass") (the Class and Subclass collectively, the "Classes").

100. Plaintiff reserves the right to modify the Class definition, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

101. The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after considering of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement.

102. The following people are excluded from the Class: (1) any Judge presiding over this action and members of her or her family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest (including current and former employees, officers, or directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

103. **Numerosity/Ascertainability:** Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff at this time; however, it is estimated that there are hundreds of thousands of individuals in the Class. The identity of such membership is readily ascertainable from Defendant's records and non-party records, such as those of Google.

104. **Typicality:** The claims of the named Plaintiff are typical of the claims of the Class because the named Plaintiff, like all other class members, booked a consultation on the Website, and had their confidential electronic communications intercepted and/or disclosed to Google.

105. **Adequate Representation:** Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Class.

106. **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Class and that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not vary between members of the Class, and which may be determined without reference to the individual circumstances of any Class member, include, but are not limited to, the following: whether Defendant violated the Federal Wiretap Act, 18 U.S.C. § 2510, *et seq.*; CIPA §§ 631 and 632; Cal. Civ. Code § 56.10, and Plaintiff's and Class Members' privacy rights as provided by the California Constitution and common law, and whether Plaintiff and the proposed Class members are entitled to damages, reasonable attorneys' fees, prejudgment interest and costs of this suit.

107. **Superiority:** Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### COUNT I
### Violation of the Federal Wiretap Act, 18 U.S.C. § 2510, *et seq.*
### (On Behalf of Plaintiff, the Nationwide Class and California Subclass)

108. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Classes.

109. The Federal Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986, makes it unlawful for a person to intentionally intercept, endeavor to intercept or procure any other person to intercept or endeavor to intercept any wire, oral or electronic communication. 18 U.S.C. § 2511(a).

110. Further, the Federal Wiretap Act makes it unlawful for a person to intentionally disclose, or endeavor to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral or electronic communication in violation of the Federal Wiretap Act. 18 U.S.C. § 2511(1)(c).

111. Further, the Federal Wiretap Act makes it unlawful for a person to intentionally use, or endeavor to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral or electronic communication in violation of the Federal Wiretap Act. 18 U.S.C. § 2511(1)(d).

112. The Federal Wiretap Act protects both the sending and receiving of communications.

113. Among other ways, a violation of the Federal Wiretap Act occurs if a person:

> (a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication; [or]

> (b) intentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication[.]

18 U.S.C. § 2511.

114. Under the Federal Wiretap Act, "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of [the Federal Wiretap Act] may in a civil action recover from the person or entity . . . which engaged in that violation such relief as may be appropriate." 18 U.S.C. § 2520(a).

115. In violation of the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a), Defendant intentionally procured third-party Google, to intercept and endeavor to intercept the electronic communications of Plaintiff and Class Members, namely the transmissions of the confidential and sensitive PII and PHI of Plaintiff and Class Members via the Website. At relevant times, Defendant knew that by integrating and embedding Google's tracking technology, Google would intercept the electronic communications of users of the Website.

116. In violation of the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a), Defendant intentionally intercepted, and endeavored to intercept, the electronic communications of Plaintiff and Class Members, namely the transmissions of the confidential and sensitive PII and PHI of Plaintiff and Class Members via the Website.

117. In violation of the Federal Wiretap Act, 18 U.S.C. § 2511(1)(c), Defendant disclosed, and endeavored to disclose, the contents of the electronic communications of Plaintiff and Class Members to generate profits and increase revenues by, *inter alia*, attempting to increase its number of patients through targeted marketing based on an analysis of the intercepted communications, knowing and having reason to know that the information was obtained through the unlawful interception of the electronic communications of Plaintiff and Class Members, in violation of the Federal Wiretap Act, as alleged herein. Indeed, Defendant procured Google to

surreptitiously intercept the communications of Plaintiff and Class Members without their consent, thereby knowing that the information from those communications was obtained in violation of the Federal Wiretap Act.

118. In violation of the Federal Wiretap Act, 18 U.S.C. § 2511(1)(d), Defendant used, and endeavored to use, the contents of the electronic communications of Plaintiff and Class Members to generate profits and increase revenues by, *inter alia*, attempting to increase its number of patients through targeted marketing based on an analysis of the intercepted communications, knowing and having reason to know that the information was obtained through the unlawful interception of the electronic communications of Plaintiff and Class Members, in violation of the Federal Wiretap Act, as alleged herein. Indeed, Defendant procured Google to surreptitiously intercept the communications of Plaintiff and Class Members without their consent, thereby knowing that the information from those communications was obtained in violation of the Federal Wiretap Act.

119. The following items constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. The codes and programs Google used to track Plaintiff's and Class Members' communications while they were navigating the Website;

b. Plaintiff's and Class Members' browsers and mobile applications;

c. Plaintiff's and Class Members' computing and mobile devices;

d. The codes and programs used by Google to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a browser or application to visit Defendant's Website; and

e. The plan Google carried out to effectuate its tracking and interception of the Plaintiff's and Class Members' communications while they were using Defendant's Website.

120. The patient communication information that Defendant permitted Google to intercept, and that Defendant otherwise disclosed to Google, via Defendant's integration of the Google tracking technology on the Website—including but not limited to: namely, the type of therapy they are looking for, areas they want to focus on (*e.g.*, depression), the approach they want their provider to take in therapy (*e.g.*, confronting trauma), preferences as to their provider's identity (*i.e.*, their provider's faith, gender, race, and/or sexuality), *where* they are seeking therapy, whether they are seeking virtual or in-person care, how they plan to pay, the name of the provider with whom they select to book a consultation, and the fact that patients actually booked a consultation—constitutes the contents of electronic communication because it includes detailed URL requests and button clicks that contain information Plaintiff and the Classes actively inputted into the Website.

121. The transmissions described above were "transfer[s] of signs, signals, writing, … data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetics, photoelectronic, or photooptical system that affects interstate commerce[,]" and were therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

122. Google was not an authorized party to the communications between Plaintiff and Class Members, on the one hand, and Defendant, on the other, because Plaintiff and Class Members did not know that these third parties were surreptitiously intercepting the data at issue and did not knowingly send any communications to Google.

123. Plaintiff and Class Members did not consent to Defendant's conduct of: (1) procuring Google to intercept and endeavor to intercept their confidential communications; (2) intercepting their confidential communications; (3) disclosing their confidential communications under circumstances that violated the Federal Wiretap Act; and (4) using their confidential communications under circumstances that violated the Federal Wiretap Act.

124. Defendant intentionally intercepted and endeavored to intercept Plaintiff's and Class Members' communications for the purpose of committing a tortious or criminal act in violation of the Constitution or laws of the United States or of any State – namely, invasion of privacy, violation of the CIPA, the CMIA, and the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1320d-6(a)(3), among others.

125. HIPAA imposes a criminal penalty for knowingly disclosing individually identifiable health information to a third party. *See* 42 U.S.C. § 1320d-6. HIPAA defines IIHI as:

> [A]ny information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and—(i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

42 U.S.C. § 1320d(6).

126. Defendant was not acting under color of law in intercepting and endeavoring to intercept Plaintiff's and Class Members' communications.

127. Defendant and Google intercepted and endeavored to intercept the communications of Plaintiff and Class Members made via the Website while those communications were in transit, as opposed to being in storage. Indeed, Defendant and Google intercepted and endeavored to intercept the communications of Plaintiff and Class Members in real time and contemporaneously with Plaintiff and Class Members engaging in those communications.

128. After intercepting the communications, Google used the contents of the communications to provide Defendant with analytics and marketing services, as well as for its own business purposes.

129. As a result of the above actions, Plaintiff and Class Members have been damaged due to the unauthorized interception, disclosure, and use of their confidential communications in violation of 18 U.S.C. § 2520. As such, Plaintiff and Class Members are entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiff and any profits made by Defendant as a result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; (2) appropriate equitable or declaratory relief; and (3) reasonable attorneys' fees and other costs reasonably incurred.

**<u>COUNT II</u>**
**Violation of the California Invasion of Privacy Act,**
**Cal. Penal Code § 631**
**(On Behalf of Plaintiff and the Subclass)**

130. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

131. Plaintiff brings this Count individually and on behalf of the members of the Subclass.

132. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the

> contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

133. CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

134. Google's tracking technology is a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

135. Google is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, Google has the capability to use the wiretapped information for its own purposes. Accordingly, Google has been a third party to any communications between Plaintiff and Subclass Members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

136. At all relevant times, through its tracking technology, Google willfully and without the consent of all parties to the communication, and/or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff

and Subclass Members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

137. At all relevant times, Google used or attempted to use the communications intercepted by its tracking technologies for its own purposes.

138. At all relevant times, Defendant aided, agreed with, employed, permitted, and otherwise enabled Google to wiretap Plaintiff and Subclass Members using Google's tracking technology and to accomplish the wrongful conduct at issue here.

139. Defendant's aiding, agreeing with, and employment of Google's wiretapping was done knowingly, willfully, and intentionally.

140. Defendant purposefully integrated, embedded, and installed the Google tracking technologies into the HTML documents and/or other libraries defining the contents of the Website.[56]

141. Defendant knows (and knew when integrating, embedding, and installing the Google tracking technologies) that Google was a separate and distinct entity from Alma, the Alma Website, the Alma consumers, and the Alma communications at issue.

142. Defendant knows (and knew when integrating, embedding, and installing the tracking technologies at issue) that Google uses its tracking technologies to eavesdrop upon and record Alma communications to which Google is not a party, and that Google thereby collects the contents of communications between Alma consumers and Alma.

143. Defendant knows (and knew when integrating, embedding, and installing the tracking technologies at issue) what, *inter alia*, the "Google Analytics Terms of Service" and

[56] *See, e.g.*, GOOGLE, [GA4] SET UP ANALYTICS FOR A WEBSITE AND/OR APP, https://support.google.com/analytics/answer/9304153?hl=en#zippy=.

webpages incorporated therein state regarding Google's use of the contents of the communications here at issue for Google's own, unlawful purposes.

144. Plaintiff and Subclass Members did not provide their prior consent to Google's intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and Subclass Members' electronic communications. Nor did Plaintiff and Subclass Members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, and otherwise enabling Google's conduct.

145. The wiretapping of Plaintiff and Subclass Members occurred in California, where Plaintiff and Subclass Members accessed the Website, and where Google—as enabled by Defendant—routed Plaintiff's and Subclass Members' electronic communications to Google's servers.

146. Pursuant to Cal. Penal Code § 637.2, Plaintiff and Subclass Members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

## COUNT III
**Violation of the California Invasion of Privacy Act,**
**Cal. Penal Code § 632**
**(On Behalf of Plaintiff and the Subclass)**

147. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

148. Plaintiff brings this Count individually and on behalf of the members of the Subclass.

149. CIPA § 632(a) provides for liability where an entity:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one

> another or by means of a telegraph, telephone, or other device, except a radio.

150. Google's tracking technologies are "electronic amplifying or recording device[s]." *Id.*

151. Cal. Civ. Code § 56.05(j) states:

> "Medical information" means any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care ... regarding a patient's medical history, mental health application information, reproductive or sexual health application information, mental or physical condition, or treatment.

152. Per Cal. Civil Code § 56.10(a):

> A provider of health care, … shall not disclose medical information regarding a patient of the provider of health care … without first obtaining an authorization, except as provided in subdivision (b) or (c).

153. Per Cal. Civ. Code § 56.10(d):

> Except to the extent expressly authorized by a patient, enrollee, or subscriber, or as provided by subdivisions (b) and (c), a provider of health care, health care service plan, contractor, or corporation and its subsidiaries and affiliates shall not intentionally share, sell, use for marketing, or otherwise use medical information for a purpose not necessary to provide health care services to the patient.

154. Here, Website users' communications with Defendant—made while browsing and booking consultations via the Website—contain sensitive and confidential "[m]edical information," as defined by Cal. Civil Code § 56.05.

155. First, the communications include "individually identifiable information[.]" Cal. Civil Code § 56.05. Defendant enables Google to identify individual Website users with Google Analytics identity spaces—a combination of user IDs, user-provided data (*i.e.*, contact details like email address, phone number, name, and/or address, etc.), device IDs, and/or machine learning-based behavioral modeling—and Google signals (which associates web browsing activity with

users' Google accounts), which, "alone or in combination with other publicly available information, reveals the identity of the individual." Cal. Civ. Code § 56.05.

156. Second, Website users' communications with Defendant relate to "a patient's medical history, mental health application information, reproductive or sexual health application information, mental or physical condition, or treatment." Cal. Civ. Code § 56.05. Google intercepts and/or otherwise obtains Website users' button clicks selecting the type of therapy they are looking for, areas they want to focus on (*e.g.*, depression), the approach they want their provider to take in therapy (*e.g.*, confronting trauma), preferences as to their provider's identity (*i.e.*, their provider's faith, gender, race, and/or sexuality), where they are seeking therapy, whether they are seeking virtual or in-person care, how they plan to pay, the name of the provider with whom they select to book a consultation, and the fact that patients actually booked a consultation.

157. Thus, Google—as aided by Defendant—intercepted "medical information," which is confidential, under Cal. Civil Code § 56.10.

158. When communicating with Defendant, Plaintiff and Subclass Members had an objectively reasonable expectation of privacy, based on Cal. Civil Code § 56.10. Thus, Plaintiff and Subclass Members did not reasonably expect that anyone other than Defendant would be on the other end of the communication, and that other third-party entities like Google would intentionally use an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Subclass Members.

159. Plaintiff and Subclass Members did not consent to Google's actions. Nor have Plaintiff or Subclass Members consented to Google's intentional use of an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Subclass Members.

160. Pursuant to Cal. Penal Code § 637.2, Plaintiff and Subclass Members have been injured by Defendant's violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 632(a).

**COUNT IV**
**Violation of the California Confidentiality of Medical Information Act**
**Cal. Civ. Code § 56.10**
**(On Behalf of Plaintiff and the Subclass)**

161. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

162. Plaintiff brings this Count individually and on behalf of the members of the Subclass.

163. Under the CMIA, providers of health care are prohibited from disclosing medical information relating to their patients, without a patient's authorization.

164. Additionally, "[e]xcept to the extent expressly authorized by a patient, enrollee, or subscriber, or as provided by subdivisions (b) and (c), a provider of health care, health care service plan, contractor, or corporation and its subsidiaries and affiliates shall not intentionally share, sell, use for marketing, or otherwise use medical information for a purpose not necessary to provide health care services to the patient." Cal. Civ. Code § 56.10(d).

165. Medical information means "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care ... regarding a patient's medical history, mental health application information, reproductive or sexual health application information, mental or physical condition, or treatment." Cal. Civ. Code § 56.05(j). "'Individually Identifiable' means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual, such as the patient's name, address, electronic mail address, telephone number, or social security number, or

other information that, alone or in combination with other publicly available information, reveals the identity of the individual." *Id*.

166. Cal. Civ. Code § 56.06(a) defines a provider of health care as "[a]ny business organized for the purpose of maintaining medical information in order to make the information available to an individual or to a provider of health care at the request of the individual or a provider of health care, for purposes of allowing the individual to manage the individual's information, or for the diagnosis and treatment of the individual[.]"

167. Cal. Civ. Code § 56.06(d) says that "[a]ny business that offers a mental health digital service to a consumer for the purpose of allowing the individual to manage the individual's information, or for the diagnosis, treatment, or management of a medical condition of the individual, shall be deemed to be a provider of health care subject to the requirements of this part."

168. Plaintiff and Subclass Members are patients under the definition of the CMIA because Plaintiff and Subclass Members received "health care services from a provider of health care," and the information Defendant disclosed and/or shared to Google was "medical information pertain[ing]" to Plaintiff and Subclass Members. Cal. Civ. Code § 56.05(m).

169. Defendant is a provider of health care under Cal. Civ. Code § 56.06(a) because it is an organization designed to provide patients with access to health care and provides a Website from which patients can manage their diagnosis or treatment of their medical conditions. Because Defendant is deemed a provider of health care, it has an ongoing obligation to comply with the CMIA's requirements regarding the maintenance of its user's medical information.

170. Defendant is also a provider of health care under Cal. Civ. Code § 56.05(d) because it is a business that offers a mental health digital service to a consumer for the diagnosis, treatment, or management of a medical condition.

171. As set forth hereinabove, Defendant enables Google to identify individual Website users with Google Analytics identity spaces—a combination of user IDs, user-provided data (*i.e.*, contact details like email address, phone number, name, and/or address, etc.), device IDs, and/or machine learning-based behavioral modeling—and Google signals (which associates web browsing activity with users' Google accounts), which are identifiers sufficient to allow identification of an individual. Along with these identifiers, Defendant disclosed and/or shared to Google several pieces of information regarding its patients' use of its Website, which, on information and belief, included, but is not limited to: the type of therapy they are looking for, areas they want to focus on (*e.g.*, depression), the approach they want their provider to take in therapy (*e.g.*, confronting trauma), preferences as to their provider's identity (*i.e.*, their provider's faith, gender, race, and/or sexuality), where they are seeking therapy, whether they are seeking virtual or in-person care, how they plan to pay, the name of the provider with whom they select to book a consultation, and the fact that patients actually booked a consultation.

172. This patient information is derived from a provider of health care regarding patients' medical treatment and mental condition. Accordingly, it constitutes medical information pursuant to the CMIA.

173. However, as demonstrated hereinabove, Defendant fails to obtain its patients' authorization for the disclosure of medical information to Google, which is done for marketing and analytics purposes.

174. Pursuant to CMIA § 56.11, a valid authorization for disclosure of medical information must: (1) be "[c]learly separate from any other language present on the same page and is executed by a signature that serves no other purpose than to execute the authorization"; (2) be signed and dated by the patient or her representative; (3) state the name and function of the third party that receives the information; and (4) state a specific date after which the authorization

expires. Accordingly, the information set forth in Defendant's Privacy Policy does not qualify as a valid authorization.

175. Based on the above, Defendant violated the CMIA by disclosing and sharing its patients' medical information to Google, along with Google Analytics identity spaces—a combination of user IDs, user-provided data (*i.e.*, contact details like email address, phone number, name, and/or address, etc.), device IDs, and/or machine learning-based behavioral modeling—and Google signals (which associates web browsing activity with users' Google accounts), while failing to obtain patients' valid authorizations for the disclosure of medical information.

176. Under the CMIA, a patient may recover compensatory damages, punitive damages not to exceed $3,000 dollars and attorneys' fees not to exceed $1,000, and the costs of litigation for any violating disclosure of medical information. Cal. Civ. Code § 56.35. Alternatively, a patient may recover nominal damages of $1,000 for any negligent release of medical information. Cal. Civ. Code § 56.36.

**COUNT V**
**Invasion of Privacy Under California's Constitution**
**(On Behalf of Plaintiff and the Subclass)**

177. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

178. Plaintiff brings this Count individually and on behalf of the members of the Subclass.

179. Plaintiff and Subclass Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications and PHI; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites

and mobile applications without being subjected to wiretaps without Plaintiff's and Subclass Members' knowledge or consent.

180. At all relevant times, by installing and embedding Google tracking technology into the Website so that Google could intercept and/or otherwise obtain users' private communications with Defendant regarding their health conditions and treatment, Defendant intentionally invaded Plaintiff's and Subclass Members' privacy rights under the California Constitution.

181. Plaintiff and Subclass Members had a reasonable expectation that their communications about their health conditions and treatment, and other private information, would remain confidential and that Defendant would not enable Google's interception of this sensitive information given that Defendant did not provide Plaintiff and Subclass Members with the required notice of its practice of disclosures.

182. Plaintiff and Subclass Members did not authorize Defendant to record and transmit Plaintiff's and Subclass Members' private medical communications alongside their personally identifiable health information.

183. This invasion of privacy is serious in nature, scope, and impact because it relates to patients' private medical communications. Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

184. Accordingly, Plaintiff and Subclass Members seek all relief available for invasion of privacy claims under California's Constitution.

**COUNT VI**
**Intrusion Upon Seclusion**
**(On Behalf of Plaintiff, the Nationwide Class and California Subclass)**

185. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Classes.

186. Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications about their health conditions and treatment; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites and applications without being subjected to wiretaps without Plaintiff's and Class Members' knowledge or consent.

187. At all relevant times, by installing and embedding the Google tracking technology into the Website, so that Google could intercept users' private communications with Defendant regarding their health conditions and treatment, Defendant intentionally invaded Plaintiff's and Class Members' privacy rights by intruding into their private place, conversation or matter. Defendant's actions amount to an intrusion upon Plaintiff's and Class Members' privacy because Plaintiff and Class Members did not consent to the particular conduct that Defendant engaged in—allowing Google to intercept their sensitive conversations related to their health concerns and treatment.

188. Plaintiff and Class Members had a reasonable expectation that their communications about their health conditions and treatment, and other private information, would remain confidential and that Defendant would not enable third party interception of this sensitive information given that Defendant did not provide Plaintiff and Class Members with the required notice of its practice of disclosures.

189. Plaintiff and Class Members did not authorize Defendant to record and transmit Plaintiff's and Class Members' private medical communications alongside their personally identifiable health information.

190. This invasion of privacy is highly offensive and serious in nature, scope, and impact because it relates to patients' private health condition and treatment communications. Moreover,

it constituted an egregious breach of the societal norms underlying the privacy right.

191. Accordingly, Plaintiff and Class Members seek all relief available for Defendant's intrusion upon their seclusion.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a. For a determination that this action is a proper class action;

b. For an order certifying the Class and Subclass, naming Plaintiff as representative of the Class and Subclass, and naming Plaintiff's attorneys as Class Counsel to represent the Class and Subclass;

c. For an order declaring that Defendant's conduct violates the statutes referenced herein;

d. For an order finding in favor of Plaintiff, the Class, and Subclass on all counts asserted herein;

e. For an award of compensatory damages, including statutory damages where available, to Plaintiff, Class, and Subclass Members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

f. For punitive damages, as warranted, in an amount to be determined at trial;

g. For an order requiring Defendant to disgorge revenues and profits wrongfully obtained;

h. For prejudgment interest on all amounts awarded;

i. For injunctive relief as pleaded or as the Court may deem proper;

j. For an order awarding Plaintiff, the Class, and the Subclass their reasonable attorneys' fees and expenses and costs of suit; and

k. For an order granting Plaintiff, Class, and Subclass Members such further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: March 20, 2026

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: *_/s/ Philip L. Fraietta_*

Philip L. Fraietta (State Bar No. 5297825)
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
Email: pfraietta@bursor.com

**DRURY LEGAL, LLC**
Scott R. Drury (*pro hac vice forthcoming*)
6 Carriage Lane
Highwood, IL 60040
Telephone: (312) 358-8225
Email: scott@drurylegal.com

*Attorneys for Plaintiff*